IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

---

ANTHONY DWAYNE BROWN,

    Petitioner,

vs.

                     Case No. 09-1083-JDB/egb

HENRY STEWARD,

    Respondent.

---

ORDER GRANTING RESPONDENT'S MOTION TO DISMISS
(DOCKET ENTRY 9)
ORDER DENYING PETITIONER'S MOTION IN OPPOSITION
(DOCKET ENTRY 11)
ORDER OF DISMISSAL
ORDER DENYING CERTIFICATE OF APPEALABILITY
AND
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH

---

On April 1, 2009, Petitioner Anthony Dwayne Brown, inmate registration number 3258962 and a prisoner at the West Tennessee State Penitentiary, Henning, Tennessee ("WTSP"), filed this petition under 28 U.S.C. § 2254. (Docket Entry ("D.E.") 1.) On July 23, 2009, the Court directed Respondent, Henry Steward, warden of WTSP, to file the state-court record and to respond to the petition. On September 23, 2009, Respondent filed a motion to dismiss the petition and, on September 24, 2009, submitted an appendix, which included the transcripts of Brown's state court proceedings. (D.E. 9 and 10). On October 14, 2009, Brown filed a motion in opposition to Respondent's motion to dismiss. (D.E. 11.)

I.  <u>STATE COURT PROCEDURAL HISTORY</u>

Petitioner was convicted of first degree premeditated murder, two counts of felony murder, one count of especially aggravated robbery, two counts of especially aggravated burglary, and theft of property valued at less than $500 in Obion County (Tennessee) Circuit Court.  The trial court merged the two felony murder counts into the first degree premeditated murder count and merged the theft offense into the count of especially aggravated robbery. The trial court also merged the two counts of especially aggravated burglary.  Brown was sentenced to life imprisonment without the possibility of parole for the first degree premeditated murder conviction.  The trial court imposed a sixty (60) year sentence for the especially aggravated robbery conviction and a thirty (30) year sentence for the especially aggravated burglary conviction, to be served concurrently with the life sentence.  Brown appealed, contending that the evidence was insufficient to support his convictions and that the trial court erred in excluding the testimony of a defense witness.  The Tennessee Court of Criminal Appeals affirmed the judgment of the trial court.  <u>See</u> <u>State v. Brown</u>, No. W2004-01139-CCA-R3-CD, 2005 WL 885132 (Tenn. Crim. App. April 18, 2005), <u>perm. app. denied</u> (Tenn. Oct. 24, 2005).

The inmate filed a post-conviction petition alleging that he was denied the effective assistance of counsel.  The post-conviction trial court denied the petition after appointing counsel

and holding an evidentiary hearing. Brown appealed and the Tennessee Court of Criminal Appeals affirmed the post-conviction court's judgment. <u>Brown v. State</u>, No. W2007-02402-CCA-R3-PC, 2008 WL 4831221 (Tenn. Crim. App. Nov. 5, 2008), <u>perm. app. denied</u> (Tenn. Mar. 16, 2009).

II.   <u>PETITIONER'S FEDERAL HABEAS CLAIMS</u>

Petitioner raises the following issues in his petition:

1.   Trial counsel rendered ineffective assistance in violation of the Sixth Amendment, by:

   A.   making a unilateral decision that Petitioner would not testify,

   B.   failing to investigate and interview two individuals who were initially considered as suspects,

   C.   not objecting to the prosecutor's improper closing argument, and

   D.   failing to interview potential alibi witnesses; and

2.   The evidence was insufficient to sustain Petitioner's convictions.

III.   <u>RESPONDENT'S MOTION TO DISMISS</u>

Steward filed a motion to dismiss alleging that Brown's petition and allegations failed to show that the adjudication of any of his claims resulted in a decision contrary to or involving an unreasonable application of federal law or resulted in a decision based on an unreasonable determination of facts in view of the evidence presented.

IV.   <u>LEGAL STANDARDS APPLICABLE TO HABEAS PETITIONS</u>

    A.   <u>Waiver and Procedural Default</u>

        Twenty-eight U.S.C. § 2254(b) states in pertinent part:

  (1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—

    (A)   the applicant has exhausted the remedies available in the courts of the State;  or

    (B)  (i)  there is an absence of available State corrective process;  or

        (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

  (2)   An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

Thus, a habeas petitioner must first exhaust available state remedies before requesting relief under § 2254.   <u>See, e.g.,</u> <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34, 107 S. Ct. 1671, 1674-75, 95 L. Ed. 2d 119 (1987); <u>Rose v. Lundy</u>, 455 U.S. 509, 516-22, 102 S. Ct. 1198, 1202-05, 71 L. Ed. 2d 379 (1982); Rule 4, Rules Governing Section 2254 Cases in the United States District Courts ("Section 2254 Rules").   A petitioner has failed to exhaust his available state remedies if he has the opportunity to raise his claim by any available state procedure.   28 U.S.C. § 2254(c); <u>Preiser v. Rodriquez</u>, 411 U.S. 475, 477, 489-90, 93 S. Ct. 1827, 1830, 1836, 36 L. Ed. 2d 439 (1973).

To exhaust his state remedies, the petitioner must have presented the very issue on which he seeks relief from the federal courts to the courts of the state that he claims is wrongfully confining him. Picard v. Connor, 404 U.S. 270, 275-76, 92 S. Ct. 509, 512, 30 L. Ed. 2d 438 (1971); Rust v. Zent, 17 F.3d 155, 160 (6th Cir. 1994). "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief." Gray v. Netherland, 518 U.S. 152, 162-63, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996), reh'g denied (Aug. 27, 1996). "[T]he substance of a federal habeas corpus claim must first be presented to the state courts[.]" Id. at 163, 116 S. Ct. at 2081 (quoting Picard, 404 U.S. at 278, 92 S. Ct. at 513). A habeas petitioner does not satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) "by presenting the state courts only with the facts necessary to state a claim for relief." Id. (citing Picard, 404 U.S. at 277, 92 S. Ct. at 513).

Conversely, "it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." Id., 116 S. Ct. at 2081. When a petitioner raises different factual issues under the same legal theory he is required to present each factual claim to the highest state court in order to exhaust his state remedies. Anderson v. Harless, 459 U.S. 4, 6, 103 S. Ct. 276, 277, 74 L. Ed.

2d 3 (1982); see also Pillette v. Foltz, 824 F.2d 494, 496 (6th Cir. 1987) (citations omitted).  He has not exhausted his state remedies if he has merely presented a particular legal theory to the courts without presenting each factual claim.  Pillette, 824 F.2d at 496-98.  The claims must be presented to the state courts as a matter of federal law.  "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." Anderson, 459 U.S. at 6, 103 S. Ct. at 277 (internal citations omitted); see also Duncan v. Henry, 513 U.S. 364, 366, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995), reh'g denied (Mar. 20, 1995) (per curiam) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

The state court decision must rest primarily on federal law. Coleman v. Thompson, 501 U.S. 722, 734-35, 111 S. Ct. 2546, 2557, 115 L. Ed. 2d 640 (1991), reh'g denied (Sept. 13, 1991).  If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the petitioner ordinarily is barred by this procedural default from seeking federal habeas review.  Id. at 729, 111 S. Ct. at 2553-54; Vang v. Nevada, 329 F.3d 1069, 1072 (9th Cir. 2003).  However, the state-

6

court decision need not explicitly address the federal claims; instead, it is enough that the petitioner's brief squarely presents the issue. Smith v. Digmon, 434 U.S. 332, 333-34, 98 S. Ct. 597, 599, 54 L. Ed. 2d 582 (1978) (per curiam); see also Baldwin v. Reese, 541 U.S. 27, 30-32, 124 S. Ct. 1347, 1350-51, 158 L. Ed. 2d 64 (2004) (a federal habeas claim is fairly presented to a state appellate court only if that claim appears in the petitioner's brief).

When a petitioner's claims have never been actually presented to the state courts, but a state procedural rule prohibits the state court from extending further consideration to them, the claims are deemed exhausted, but procedurally barred. Teague v. Lane, 489 U.S. 288, 297-99, 109 S. Ct. 1060, 1068-69, 103 L. Ed. 2d 334 (1989), reh'g denied (Apr. 17, 1989); Rust, 17 F.3d at 160.

A petitioner confronted with either variety of procedural default must show cause for the default and that he was prejudiced in order to obtain federal court review of his claim. Teague, 489 U.S. at 297-99, 109 S. Ct. at 1068-69; Wainwright v. Sykes, 433 U.S. 72, 87-88, 97 S. Ct. 2497, 2506-07, 53 L. Ed. 2d 594 (1977), reh'g denied (Oct. 3, 1977). Cause for a procedural default depends on some "objective factor external to the defense" that interfered with the petitioner's efforts to comply with the procedural rule. Coleman, 501 U.S. at 752-53, 111 S. Ct. at 2566; Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L.

Ed. 2d 397 (1986).

A petitioner may avoid the procedural bar, and the necessity of showing cause and prejudice, by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750, 111 S. Ct. at 2565. The petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 851, 867, 130 L. Ed. 2d 808 (1995) (quoting Murray, 477 U.S. at 496, 106 S. Ct. at 2649-50). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Id., 115 S. Ct. at 867.

B.   Merits Review

The standard for reviewing a habeas petitioner's constitutional claims on the merits is stated in 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding.

This Court must determine whether the state court adjudications of the claims that were decided on the merits were either "contrary to" or an "unreasonable application of" "clearly established" federal law as determined by the United States Supreme Court.  This Court must also determine whether the state court decision on each issue was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding.

    1.   § 2254(d)(1)

The Supreme Court has issued a series of decisions establishing the standards for applying § 2254(d)(1).[1]  In Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), the Court emphasized that the "contrary to" and "unreasonable application of" clauses should be accorded independent meaning. Williams, 529 U.S. at 364, 120 S. Ct. at 1498.  A state-court decision may be found to violate the "contrary to" clause under two circumstances:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .  A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.  Accordingly, in either of these two scenarios, a federal court will be unconstrained by §

---

[1]    By contrast, there is little caselaw about the standards for applying § 2254(d)(2).

> 2254(d)(1) because the state-court decision falls within
> that provision's "contrary to" clause.

Id. at 405-06, 120 S. Ct. at 1519-20 (internal citations omitted);

see also Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848,

1853, 155 L. Ed. 2d 877 (2003); Lockyer v. Andrade, 538 U.S. 63,

73, 123 S. Ct. 1166, 1173, 155 L. Ed. 2d 144 (2003); Bell v. Cone,

535 U.S. 685, 694, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002),

reh'g denied (Aug. 5, 2002).[2]  The Supreme Court has emphasized the

narrow scope of the "contrary to" clause, explaining that "a run-

of-the-mill state-court decision applying the correct legal rule

from our cases to the facts of a prisoner's case would not fit

comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams,

529 U.S. at 406, 120 S. Ct. at 1520; see also id. at 407, 120 S.

Ct. at 1520 ("If a federal habeas court can, under the 'contrary

to' clause, issue the writ whenever it concludes that the state

court's application of clearly established federal law was

incorrect, the 'unreasonable application' clause becomes a

nullity.").

A federal court may grant the writ under the "unreasonable

application" clause "if the state court correctly identifies the

governing legal principle from [the Supreme Court's] decisions but

unreasonably applies it to the facts of the particular case."

---

[2]    The Supreme Court has emphasized that this standard "does not require
citation of our cases -- indeed, it does not even require awareness of our cases,
so long as neither the reasoning nor the result of the state-court decision
contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed.
2d 263 (2002), reh'g denied (Jan. 13, 2003) (per curiam) (emphasis in original).

<u>Cone</u>, 535 U.S. at 694, 122 S. Ct. at 1850 (citation omitted); <u>see also</u> <u>Lockyer</u>, 538 U.S. at 75, 123 S. Ct. at 1174; <u>Williams</u>, 529 U.S. at 409, 120 S. Ct. at 1521.[3]  "[A]n <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law."  <u>Williams</u>, 529 U.S. at 410, 120 S. Ct. at 1522 (emphasis in original).[4]  "[A] federal habeas court making the

---

[3]  Although the Supreme Court in <u>Williams</u> recognized, <u>in dicta</u>, the possibility that a state-court decision could be found to violate the "unreasonable application" clause when "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply," the Court expressed a concern that "the classification does have some problems of precision."  <u>Williams</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-21.  The <u>Williams</u> Court concluded that it was not necessary in the case before it "to decide how such 'extension of legal principle' cases should be treated under § 2254(d)(1)."  <u>Id.</u> at 408-09, 120 S. Ct. at 1521.  In <u>Yarbrough v. Alvarado</u>, 541 U.S. 652, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004), the Supreme Court further stated:

> Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.  Cf. <u>Teague</u> [].  At the same time, the difference between applying a rule and extending it is not always clear.  Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.

<u>Yarbrough</u>, 541 U.S. at 666, 124 S. Ct. at 2151.

[4]  <u>See also</u> <u>Lockyer</u>, 538 U.S. at 75, 123 S. Ct. at 1175 (lower court erred by equating "objectively unreasonable" with "clear error"; "These two standards, however, are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002), <u>reh'g denied</u> (Jan. 13, 2003) (per curiam) (holding that the lower court "did not observe this distinction [between an incorrect and an unreasonable application of federal law], but ultimately substituted its own judgment for that of the state court, in contravention of [§ 2254(d)]."); <u>Cone</u>, 535 U.S. at 698-99, 122 S. Ct. at 1852 ("For [a habeas petitioner] to succeed . . . , he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being  analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly."); <u>Williams</u>, 529 U.S. at 411, 120 S. Ct. at 1522 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.").

11

'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id.</u> at 409, 120 S. Ct. at 1521.[5]

Section 2254(d)(1) refers to "clearly established" federal law, "as determined by the Supreme Court of the United States." This provision "expressly limits the source of law to cases decided by the United States Supreme Court." <u>Harris v. Stovall</u>, 212 F.3d 940, 944 (6th Cir. 2000), <u>cert. denied</u>, 532 U.S. 947, 121 S. Ct. 1415, 149 L. Ed. 2d 356 (2001). As the Sixth Circuit has explained:

> This provision marks a significant change from the previous language by referring only to law determined by the Supreme Court. A district court or court of appeals no longer can look to lower federal court decisions in deciding whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

<u>Herbert v. Billy</u>, 160 F.3d 1131, 1135 (6th Cir. 1998), <u>reh'g & suggestion for reh'g en banc denied</u> (Jan. 21, 1999) (citing 17A C. Wright, A. Miller & E. Cooper, <u>Federal Practice and Procedure</u> § 4261.1 (2d ed. Supp. 1998)); <u>see also</u> <u>Harris</u>, 212 F.3d at 944 ("It was error for the district court to rely on authority other than that of the Supreme Court of the United States in its analysis under § 2254(d)."). In determining whether a rule is "clearly

---

[5]    <u>See also</u> <u>Brown v. Payton</u>, 544 U.S. 133, 147, 125 S. Ct. 1432, 1442, 161 L. Ed. 2d 334 (2005)("Even were we to assume the 'relevant state-court decision applied clearly established federal law erroneously or incorrectly,' there is no basis for further concluding that the application of our precedents was 'objectively unreasonable.'")

established," a habeas court is entitled to rely on "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412, 120 S. Ct. at 1523.

2.   § 2254(d)(2)

Few cases address the standards for applying § 2254(d)(2), which permits federal courts to grant writs of habeas corpus where the state court's adjudication of a petitioner's claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  In a decision applying this standard, the Supreme Court observed that § 2254(d)(2) must be read in conjunction with 28 U.S.C. § 2254(e)(1), which provides that a state court's factual determinations are presumed to be correct unless rebutted by clear and convincing evidence.  Miller-El v. Dretke, 545 U.S. 231, 240, 125 S. Ct. 2317, 2325, 162 L. Ed. 2d 196 (2005).[6]  It appears that the Supreme Court has, in effect, incorporated the standards applicable to the "unreasonable application" prong of § 2254(d)(1).  Rice v. Collins, 546 U.S. 333, 341-42, 126 S. Ct. 969, 976, 163 L. Ed. 2d 824 (2006) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to

---

[6]    But cf. Rice v. Collins, 546 U.S. 333, 338-89, 126 S. Ct. 969, 974, 163 L. Ed. 2d 824 (2006) (recognizing that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable).

supersede the trial court's credibility determination."). That is consistent with the approach taken by the Sixth Circuit, which stated, in an unpublished decision, that

> a federal habeas court may not grant habeas relief under § 2254(d)(2) simply because the court disagrees with a state trial court's factual determination. Such relief may only be granted if the state court's factual determination was "objectively unreasonable" in light of the evidence presented in the state court proceedings. Moreover . . . , the state court's factual determinations are entitled to a presumption of correctness, which is rebuttable only by clear and convincing evidence.

Young v. Hofbauer, 52 F. App'x 234, 237 (6th Cir. 2002) (citing 28 U.S.C. § 2254(e)(1));[7] see also Stanley v. Lazaroff, 82 F. App'x 407, 416 (6th Cir. 2003); Jackson v. Holland, 80 F. App'x 392, 400 (6th Cir. 2003), rev'd on other grounds, Holland v. Jackson, 542 U.S. 649, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) ("Though the Supreme Court has not yet interpreted the 'unreasonable determination' clause of § 2254(d)(2), based upon the reasoning in Williams, it appears that a court may grant the writ if the state court's decision is based on an objectively unreasonable determination of the facts in light of the evidence presented during the state court proceeding.").

V.   ANALYSIS

All of Petitioner's claims were presented to the Tennessee state courts and have been properly exhausted. For the sake of

---

[7]   See also Sumner v. Mata, 449 U.S. 539, 546-47, 101 S. Ct. 764, 769, 66 L. Ed. 2d 722 (1981)(applying presumption of correctness to factual determinations of state appellate courts).

clarity, the Court will analyze the issue raised on direct appeal first.

A.  Issue 2: Sufficiency of the Evidence

Brown alleges that the evidence was insufficient to support his convictions and that the state court's decision was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  He relies on the absence of physical evidence linking him to the crime and the inconsistencies in the testimony of witnesses.  Respondent asserts that Petitioner cannot show that the denial of relief in the state courts was contrary to, or an unreasonable application of, clearly established federal law or was based on an unreasonable determination of the facts.

The Tennessee Court of Criminal Appeals summarized and reviewed the evidence underlying Brown's conviction:

> On the morning of May 1, 2003, Hilon Pruitt, the victim in this case, did not show up for work.  Concerned, Jerry Sherrill, Sr., and William Crowell ("Mustard"), two co-workers and friends of the eighty-one-year-old victim, went to his residence where they discovered his body lying face up in the living room.  A console television was turned over and lying on his legs, butcher knives were sticking out of his abdomen and neck, and an ice pick protruded from the center of his neck.  A portable television that had been smashed down on his head was lying beside his body.  Sherrill and Mustard lifted the television off the victim's legs and called the police.
>
> Police officers, Tennessee Bureau of Investigation (T.B.I.) Agent Joe Walker, and the county medical examiner, Dr. Allen C. Gooch, soon arrived at the scene. Inside the home, Agent Walker searched for fingerprints left by the assailant, finding a blood pattern in the

15

dining room and a palm print on the back of the
television.  The pattern in the print on the television
indicated that the assailant had worn gloves.  The
unidentified assailant left the kitchen utensil drawer
open and the victim's billfold lying beside his body.
Although the billfold contained no cash, approximately
$900 was found in the victim's front right shirt pocket.
A trigger guard and a firing mechanism also lie [sic]
next to the victim's body, but no gun was ever recovered.

Based upon the condition of the victim's body, Dr. Gooch
determined the time of death to have been between 7:00
p.m. and 12:00 a.m. on the previous night of April 30,
2003.  An autopsy revealed that the cause of death was
the result of multiple injuries, including eight major
stab wounds to the victim's body as well as blunt
injuries to his head and neck. Dr. O.C. Smith, who was
responsible for performing the autopsy, could not
determine whether an unfound item may have caused some of
the injuries or whether more than one assailant
perpetrated the crime.

[Brown] was charged with the crimes based upon the
testimony of several witnesses.  However, initially,
several other suspects were considered due to their
histories, including Scott Haynes. Haynes was stopped by
police officers for questioning regarding a separate home
invasion that occurred in Crockett County two nights
after the murder of the victim in this case.  This home
invasion also involved the assault of an older man.  When
stopped, Haynes took off running.  An inventory search of
Haynes' vehicle uncovered a glove with a weave pattern
similar to the weave pattern in the print found at the
victim's home.  However, the glove was a common "stock
variety glove," and the palm print was never checked
against that of Haynes.  Because no physical evidence
connected Haynes to the crime, Agent Walker ultimately
disregarded Haynes as a potential suspect.  Furthermore,
Haynes had an alibi:  his stepdaughter, Joyce Cavness,
stated that Haynes was having a cookout the night of
April 30, 2003, and that she was there until 8:30 p.m. or
9:00 p.m.

At trial, the victim's daughter, Linda Brown, testified
that her father would have been asleep by 9:00 p.m. and
that he did not leave her house on the night of April 30,
2003, until about 7:15 p.m.  Milton Snow testified that
he received a call from his nephew, [Anthony Brown],

around 8:40 p.m. on the evening of the murder.  Snow, who stated that he was babysitting at the time, testified that [Brown] confessed to killing the victim.  Snow stated that [Brown] admitted to stabbing the victim and to pushing a television onto his head.  Snow stated that [Brown] showed him twelve dollars stained with blood which he stated that he had stolen from the victim.

Joshua McElrath testified that he saw [Brown] on the basketball courts on Nash Street at about 8:30 p.m. on the night of the victim's murder.  Contrary to Snow's testimony that he was babysitting, McElrath stated that Snow was at the basketball courts with him and [Brown]. [Brown] looked "like he had just got out of the shower or something . . . he was nervous."  McElrath testified that [Brown] then confessed the crime to him, stating that "the old man jumped on his back" and that he just "snapped and he killed him."  At first McElrath did not believe [Brown], so he followed [Brown] over to the victim's house and saw "the old man laying on the floor with some knives in him."  McElrath stated that [Brown] did not implicate anyone else in the crime.

Robbie Walker testified that [s]he saw [Brown] coming from the side of the victim's house about four days prior to the murder and that he appeared nervous and sweating. She remembered overhearing [Brown] recount the murder while she pretended to be asleep.  Walker stated that [Brown] admitted that "he got high off some pills, and he didn't have nothing to do, so he went over there and he beat the old man till his arms got tired, then he started sticking the old man."  Walker stated that [Brown] referred to the victim's blood as red "Kool-Aid," [Brown]'s favorite color.  Contrary to Walker's belief that [Brown] was speaking to Snow and "Tie Dye," an alleged nickname for Stacey Parham, Parham denied ever being present.  Parham stated it was only later that he asked [Brown] about the crime and was told "stay out of my business."

During the course of the trial, the State also introduced several witnesses who testified that, while in jail, [Brown] admitted his involvement in the crime.  Timothy McPherson, who stated that he was in the same jail pod with [Brown], testified that [Brown] told other inmates that he had messed up his life because he killed a man over twelve dollars.

Joseph Isbell testified that [Brown] was showing crime scene pictures that he had received from his lawyer around in jail. Isbell stated that [Brown] admitted to the crime, but implicated a second assailant. Isbell testified that [Brown] admitted to getting the knives out of the victim's drawer and that he was retaliating because the "man was calling the police and stuff on him saying they was trafficking and stuff, a lot of trafficking."

Jerry Sullivan also testified to overhearing [Brown] admit to the murder while in jail. Sullivan stated:

> [Brown] told about how they got together, him and this dude got high, snorted some powder, smoked some weed, and told the dude they was going to get him. So he snuck up on him in his house, and dude was bending over looking at the television, or doing something, and he snuck up on the dude and told the dude, "Hey, what did I tell you about what I was going to do to you?" So when the dude turned around-see, I didn't know it was an old man at that time. I thought it was a young dude about like our age, that he was trying to interfere with dude's business out there on the street. . . . So when dude turned around, he said, "Didn't I tell you what I was going to do to you," the old man said, "Whatcha doing here," and he stabbed him in the stomach.

Sullivan also testified that [Brown] implicated another assailant in the crime.

Timothy Carr was also in the same jail pod with [Brown]. Carr testified that [Brown] "admitted to doing some of it, but he said he didn't act alone." Carr stated that [Brown] implicated McElrath as the other assailant. Carr further testified that [Brown] has threatened him and asked him to ensure that Snow and Walker were not available to testify. According to Lieutenant Rick Kelly of the Union City Police Department, [Brown] is affiliated with the Vice Lords, whereas Carr is affiliated with a rival gang, the Gangster Disciples.

The defense argued that T.B.I. forensic scientists, Darrin Shockey and Donna Nelson, were not able to match any physical evidence from the scene to [Brown]. The only DNA present under the victim's fingernails and at

the scene was either the victim's own or matched to an unknown person.  The defense urged the jury to consider the possibility that the crime was committed by one of the other initial suspects.  Kay Perkins, who lived near the victim, testified to seeing Haynes and another man riding up and down the streets in the neighborhood "a couple of days to a week prior to the murder."  Nolan Simms also testified to seeing Haynes in the area near the time of the murder, at Jerry Sherrill's salvage yard. Ann Sellers, another neighbor, saw a "strange car" pull into the neighborhood on the night of the victim's murder.  Sellers testified that two white males "dressed like womens" exited the car and then, about twenty or thirty minutes later, "left like they was in a hurry."

The defense also attempted to introduce the testimony of Pam Byrd, and the State requested "a jury-out hearing on the relevance."  Byrd was stabbed about twelve years ago by her ex-husband, Robert Kimmons,[8] another initial suspect in this case.  The defense sought to introduce her testimony because "it demonstrates that one of the two suspects . . . had a tendency to use a knife."  The trial judge sustained the State's objection to the testimony, stating:  "she will not be allowed to testify to something that Mr. Kimmons did 12 years ago.  There's nothing to tie Mr. Kimmons to this case."

At the conclusion of the evidence, the jury found [Brown] guilty of premeditated first degree murder; two counts of felony murder, especially aggravated robbery, two counts of especially aggravated burglary, and theft of property valued at under $500.

During the sentencing phase of the trial, the State requested the trial court to impose a life sentence without the possibility of parole.  The trial court stated:

> Mr. Brown, you've been convicted of three different counts of first degree murder. Counts 2 and 3 shall be merged into Count 1, which is premeditated murder.  In accordance with the verdict of the jury, you are sentenced to life imprisonment without the possibility of parole.

---

[8]   "Robert Kimmons" is one and the same as "Robert Kemmons," as his name is later spelled in the record.

A subsequent hearing for sentencing on the remaining charges was held on April 30, 2004. The trial court stated:

> Mr. Brown, in addition to the homicide sentence, you have two Class A sentences-two Class A felonies to be sentence[d]. The record is clear that you are a career offender. The mandatory sentence for a career offender who has been convicted of a Class A felony is 60 years. The only decision that the Court has about that is . . . whether to run them concurrently or consecutively. In view of your life without parole record, I don't see any need to run these consecutively. I am going to run the two sentences concurrently.[9]

At the hearing, [Brown]'s motion for new trial was also heard. The trial court denied the motion and, alongside other grounds presented in the motion, addressed both issues which [Brown] now presents on appeal:

> Ground No. 1 is that the evidence contained in the record is insufficient, as a matter of law, to support the verdict of guilty-of the jury finding the defendant guilty. The Court thinks that the evidence is sufficient, as a matter of law, to support the verdict of guilty. There were a number of witnesses who testified in this case. . . . Seven separate witnesses. All related conversations that they had with [Brown] in which [he] made admissions of guilt. That is not the only testimony in the record of the guilt of [Brown], but those are all people who [he] knew and talked with and admitted guilt. . . . [F]rom the testimony of those witnesses, the evidence is more than sufficient to convict him beyond a reasonable doubt.
>
> ...
>
> The second ground is, the Trial Court erred in not permitting the testimony of Ms. Pam Byrd to be

---

[9]     In contrast to this statement, the record reflects that [Brown] was being sentenced on only one Class A felony, especially aggravated robbery. The second offense, especially aggravated burglary, is a Class B felony. However, the record reflects that the judgments were entered properly and in accordance with the sentencing guidelines.

admitted into evidence. That testimony was
tendered to the Court. Basically, her testimony
was that she was previously married to a man named
Kemmons, that she was assaulted by him during their
marriage. She was stabbed a number of times. The
significance of Mr. Kemmons is that the defense
argued that the jury might ought to consider him as
having committed the crime rather than [Brown],
because he was a suspect at one time in the case.
There was no evidence whatsoever in the case that .
. . Mr. Kemmons was in any way involved with this
murder. The defense was unable to produce any
evidence to tie him in other than some
investigation being made at the front-end of the
case, or right after the crime occurred. The Court
does not find it was error to [not] permit Ms. Byrd
to testify, and I think it was completely
irrelevant.

....

The motion for new trial is denied.

[Brown] then filed notice of appeal.

State v. Brown, 2005 WL 885132, at *1-*5.

The Tennessee Court of Criminal Appeals reviewed Petitioner's

challenge to the sufficiency of the evidence and determined:

[Brown] contends that the evidence was insufficient to
support any of his convictions. When the sufficiency of
the convicting evidence is challenged, the relevant
question of the reviewing court is "whether, after
viewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found
the essential elements of the crime beyond a reasonable
doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979);
see also Tenn. R. App. P. 13(e) ("Findings of guilt in
criminal actions whether by the trial court or jury shall
be set aside if the evidence is insufficient to support
the findings by the trier of fact of guilt beyond a
reasonable doubt."). We do not reweigh the evidence but
presume that the jury has resolved all conflicts in the
testimony and drawn all reasonable inferences from the
evidence in favor of the State. See State v. Sheffield,
676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571

S.W.2d 832, 835 (Tenn. 1978). Questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Moats, 906 S.W.2d 431, 433 (Tenn. 1995)(citation omitted). The Tennessee Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 405 S.W.2d 768, 771 (Tenn. 1966). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder can be defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1)(2003). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2003).

Whether an act was done with premeditation is a question for the jury and may be inferred from the manner and

circumstances surrounding the killing.  State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993).  Since the trier of fact cannot speculate as to what was in the defendant's mind, the existence of facts of premeditation must be determined from the defendant's conduct in light of the surrounding circumstances.  See State v. Hall, 958 S.W.2d 679, 704 (Tenn. 1997).  Several relevant circumstances have been held to provide the requisite indicia of premeditation:

> [T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing.

State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998).

Taken in the light most favorable to the State, the evidence reveals that [Brown] entered the victim's home and killed the victim with premeditation.  The trial court noted that seven separate witnesses "related conversations that they had with [Brown] in which [he] made admissions of guilt."  The defense argues that inconsistencies in some of the witnesses' testimonies shed doubt upon their validity and contends that some of the witnesses are gang-affiliated and therefore biased.  However, such questions involving the credibility of witnesses and the factual issues underlying the alleged inconsistencies are to be determined by the jury.  The jury accredited the testimony of the State's witnesses.

The factors that provide the indicia for premeditation are established by the evidence and could be found by a rational trier of fact.  No evidence indicates that the elderly victim was armed at the time that he was beaten and stabbed.  Based upon the cause of death and instrumentalities used, a jury could have found that the nature of this murder was particularly cruel.  Furthermore, a jury could find premeditation after hearing the testimony of Isbell: [Brown] was retaliating because the "man was calling the police and stuff on him saying they was trafficking and stuff, a lot of trafficking."  Consequently, the evidence is clearly sufficient to sustain [Brown]'s conviction for first degree premeditated murder.

In order to sustain the jury's findings of guilt for each of [Brown]'s two first degree felony murder convictions, we must first find that the evidence is sufficient to support the underlying felony convictions.  Especially aggravated robbery underlies [Brown]'s first felony murder conviction.  Tennessee Code Annotated section 39-13-401(a)(2003) defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Especially aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury."  Tenn. Code Ann. § 39-13-403(a)(2003).

Especially aggravated burglary underlies [Brown]'s second felony murder conviction.  A person commits aggravated burglary when he or she enters a habitation without the effective consent of the owner and "commits or attempts to commit a felony, theft or assault" or enters with the "intent to commit a felony, theft or assault."  Tenn. Code Ann. § 39-14-402(a),-403(a)(2003).  Especially aggravated burglary is the above accompanied by serious bodily injury to the victim.  Tenn. Code Ann. § 39-14-404 (2003).

[Brown]'s conduct obviously constituted especially aggravated burglary because the jury concluded that he entered the victim's home without consent and committed theft and a murder.  The evidence is also sufficient to support a conviction for especially aggravated robbery. The victim's billfold was found devoid of money lying near his body.  At trial, McPherson testified that [Brown] had told people that he had messed up his life because he killed a man over twelve dollars.  Snow stated that [Brown] showed him twelve dollars stained with blood which he had stolen from the victim.  A jury could have easily found that [Brown] instilled fear into the eighty-one year old victim and committed the theft and murder using deadly weapons:  knives and an ice pick. Thus, the evidence supports [Brown]'s convictions for especially aggravated robbery and especially aggravated burglary.  Upon finding that the evidence supports the commission of these felonies during the course of the murder, we hold that the evidence was sufficient to enable a rational trier of fact to find [Brown] guilty of first degree felony murder.

The final conviction that the jury imposed was for theft of property valued at under $500.  The same above-stated

reasons that the evidence supports the especially aggravated robbery charge under which this offense was merged support this conviction.

...

Following our review of the record, we affirm the judgment of the trial court.

State v. Brown, 2005 WL 885132, at *5-7.

The Court of Criminal Appeals decision is not an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1). In Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), reh'g denied (Oct. 1, 1979), the United States Supreme Court set forth the standard that a petitioner must satisfy to prevail on a sufficiency of the evidence claim:

> We hold that in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 —- if the settled procedural prerequisites for such a claim have otherwise been satisfied —- the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

Jackson, 443 U.S. at 324, 99 S. Ct. at 2791-92 (footnote omitted). In making this assessment, the evidence presented at trial must be viewed in the light most favorable to the prosecution. Id. at 319, 99 S. Ct. at 2789.[10] The Supreme Court's opinion also makes clear that the prosecution in a criminal trial is not "under an affirmative duty to rule out every hypothesis except that of guilt

---

[10] The Supreme Court emphasized that a habeas court is not to substitute its own views for those of the jury. Jackson, 443 U.S. at 318-19, 99 S. Ct. at 2788-89.

beyond a reasonable doubt." Id. at 326, 99 S. Ct. at 2792-93.  The Court of Criminal Appeals, expressly referring to Jackson, reviewed the evidence presented at trial and applied that clearly established precedent correctly and in an objectively reasonable manner.

As set forth in the opinion of the Tennessee Court of Criminal Appeals, there is no question that, viewed in the light most favorable to the prosecution, a rational juror could find Brown guilty of first degree premeditated murder, especially aggravated robbery, and especially aggravated burglary.  Seven witnesses testified that Petitioner confessed to killing the victim.

Petitioner's uncle, Milton Snow, testified that Petitioner confessed to killing the victim by stabbing him a few times and pushing a television on his head.  (D.E. 10-7 at 109-10.)  Joshua McElrath testified that he did not believe Brown's claim of killing the victim until Petitioner took McElrath to the victim's house, where he saw the victim "laying on the floor with some knives in him."  (D.E. 10-7 at 120-21.)  Robbie Walker stated that she overheard Petitioner telling two men that he beat and stabbed the victim.  (D.E. 10-8 at 18.)  Four inmates who were incarcerated at the Obion County Jail with Brown related that Petitioner told them that he killed the victim.  (D.E. 10-8 at 30-31, 34-36, 41-42, 44.)  One of the inmates, Timothy McPherson, testified that Brown stated that he had messed up his life by killing a man over twelve

dollars.  (D.E. 10-8 at 30-31.)  Petitioner's uncle testified that
the inmate showed him twelve dollars stained with blood at the time
he confessed to killing the victim.  (D.E. 10-7 at 97.)  Inmate
Joseph Isbell testified that Brown stated he stabbed the victim
with knives from a drawer in the victim's kitchen.  (D.E. 10-8 at
35-36.)  The jury heard the testimony of all these witnesses,
including defense witnesses who testified about the presence of
other suspects and strangers in the neighborhood around the time of
the murder.  Any conflicts in the testimony were resolved against
Petitioner.

Even if a possibility existed that Brown could clear the
hurdle erected by § 2254(d), this Court would be bound by the
Tennessee Court of Criminal Appeals' factual determinations, and
those findings require the conclusion that the jury verdict
complied with <u>Jackson</u>.  Issue 2 is without merit.

B.   <u>Issues 1A-D: Counsel's Ineffective Assistance</u>

<u>Applicable Legal Standards</u>

A claim that ineffective assistance of counsel has deprived a
defendant of his Sixth Amendment right to counsel is controlled by
the standards stated in <u>Strickland v. Washington</u>, 466 U.S. 668,
687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984):

> A convicted defendant's claim that counsel's assistance
> was so defective as to require reversal of a conviction
> or death sentence has two components.  First, the
> defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made
> errors so serious that counsel was not functioning as the

27

"counsel" guaranteed the defendant by the Sixth
Amendment. Second, the defendant must show that the
deficient performance prejudiced the defense. This
requires showing that counsel's errors were so serious as
to deprive the defendant of a fair trial, a trial whose
result is reliable. Unless a defendant makes both
showings, it cannot be said that the conviction or death
sentence resulted from a breakdown in the adversary
process that renders the result unreliable.

To demonstrate deficient performance by counsel, a defendant

must first demonstrate that "counsel's representation fell below an

objective standard of reasonableness." Id. at 688, 104 S. Ct. at

2064.

Judicial scrutiny of counsel's performance must be highly
deferential. It is all too tempting for a defendant to
second-guess counsel's assistance after conviction or
adverse sentence, and it is all too easy for a court,
examining counsel's defense after it has proved
unsuccessful, to conclude that a particular act or
omission of counsel was unreasonable. A fair assessment
of attorney performance requires that every effort be
made to eliminate the distorting effects of hindsight, to
reconstruct the circumstances of counsel's challenged
conduct, and to evaluate the conduct from counsel's
perspective at the time. Because of the difficulties
inherent in making the evaluation, a court must indulge
a strong presumption that counsel's conduct falls within
the wide range of reasonable professional assistance;
that is, the defendant must overcome the presumption
that, under the circumstances, the challenged action
"might be considered sound trial strategy."

Id. at 689, 104 S. Ct. at 2065 (internal citation omitted); see

also Coe v. Bell, 161 F.3d 320, 342 (6th Cir. 1998), cert. denied,

528 U.S. 842, 120 S. Ct. 110, 145 L. Ed. 2d 93 (1999) ("The

specifics of what Coe claims an effective lawyer would have done

for him are too voluminous to detail here. They also largely miss

28

the point:  just as (or more) important as what the lawyer missed
is what he did not miss.  That is, we focus on the adequacy or
inadequacy of counsel's actual performance, not counsel's
(hindsight) potential for improvement."); <u>Adams v. Jago</u>, 703 F.2d
978, 981 (6th Cir. 1983) ("a defendant has not been denied
effective assistance by erroneous tactical decisions if, at the
time, the decisions would have seemed reasonable to the competent
trial attorney").

The Court should "assess counsel's overall performance
throughout the case in order to determine whether the 'identified
acts or omissions' overcome the presumption that a counsel rendered
reasonable professional assistance." <u>Kimmelman v. Morrison</u>, 477
U.S. 365, 386, 106 S. Ct. 2574, 2589, 91 L. Ed. 2d 305 (1986); <u>see
also</u> <u>Rogers v. Koehler</u>, No. 86-1857, 1987 WL 37783, at *2 (6th Cir.
June 23, 1987) (per curiam), <u>cert. denied</u>, 484 U.S. 988, 108 S. Ct.
508, 98 L. Ed. 2d 506 (1987) ("The habeas lawyer is usually not the
trial lawyer and it is very easy for one person's strategy to
emerge years later as another person's error.  Therefore, we
evaluate on the total performance of trial counsel and the question
of prejudice.")

A prisoner attacking his conviction bears the burden of
establishing that he suffered some prejudice from his attorney's
ineffectiveness. <u>Lewis v. Alexander</u>, 11 F.3d 1349, 1352 (6th Cir.
1993).  "[A] court need not determine whether counsel's performance

was deficient before examining the prejudice suffered by the defendant[.]" Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. Id., 104 S. Ct. at 2069.

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068; see also Johnson v. Bell, 525 F.3d 466, 486-87 (6th Cir. 2008), cert. denied, ___ U.S. ___, 129 S. Ct. 1668, 173 L. Ed. 2d 1039 (2009) (citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. In analyzing prejudice,

> the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.

Lockhart v. Fretwell, 506 U.S. 364, 368, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993) (quoting United States v. Cronic, 466 U.S. 648, 658, 104 S. Ct. 2039, 2046, 80 L. Ed. 2d 657 (1984)); see also Strickland, 466 U.S. at 686, 104 S. Ct. at 2064 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a

just result."). "Thus an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." Lockhart, 506 U.S. at 369, 113 S. Ct. at 842 (footnote omitted). To prevail on an ineffective assistance of counsel claim, Brown must satisfy both the deficient performance and prejudice prongs of Strickland. See Harries v. Bell, 417 F.3d 631, 636 (6th Cir. 2005) (To prevail on an ineffective-assistance-of-counsel claim, a petitioner must satisfy both prongs of the Strickland test: performance and prejudice.").

<u>Application</u>

The Tennessee Court of Criminal Appeals summarized the testimony at the post-conviction hearing as follows:

> At the hearing, trial counsel testified that he met with the petitioner several times and received the names of potential witnesses. He said he had information that before his involvement in the case, the authorities suspected individuals named Scotty Haynes and Robert Kimmons of committing the crimes. He said he spoke with Special Agent Joe Walker about these individuals and learned that Haynes had been arrested in Minnesota and Kimmons was in the Crockett County Jail. He said his investigators were unable to talk to Kimmons because his attorneys would not allow it. He said he encouraged Rick Kelly of the Union City Police Department to talk to Kimmons, as well, but that he did not think Kelly ever did so despite his having talked to Kelly on a near-daily basis for several weeks. He said he also attempted to convince Walker and Kelly to go to Minnesota and obtain a palm print from Haynes for comparison with one found at the crime scene but that they would not do so. He said he thought it would have been a waste of time to subpoena Kimmons for trial because Kimmons' lawyers probably would have been successful in having the trial court rule that Kimmons would not testify and that even if Kimmons did

take the stand, he would probably invoke his Fifth
Amendment privilege. Counsel acknowledged that he knew
the authorities had discovered a bloody glove print in
the victim's home as well as a glove with the same
pattern in Haynes' car.

Trial counsel testified that he presented evidence of a
woman who had seen two white men, one of whom was
identified as Haynes, driving around the neighborhood
where the victim lived a week or two before the murder.
He said there was evidence Haynes was at a cookout on the
evening of the crimes but that he was able to show that
Haynes nevertheless had the opportunity to commit the
crimes after he left the cookout.

Trial counsel testified that he presented evidence that
Kimmons had a friend whose father was a friend of the
victim. He said he did this in an attempt to connect
Kimmons and Haynes to the victim's murder.

Trial counsel testified that he talked to the victim of
a similar crime committed by Haynes and Kimmons. Counsel
said the victim claimed that a twelve-year-old Mexican
boy who told him that Haynes had said he thought he had
committed a murder and needed to get out of town. He
said he was able to get a deputy sheriff to speak with
the child but that the child "was not at all helpful."

Trial counsel testified that the petitioner identified
Tanika Brown, Frederick Pirtle, and Laretha Bledsoe as
alibi witnesses. He said that to the best of his
recollection, he investigated Mr. Pirtle and Ms. Bledsoe
and both were "dead ends." He said that to the best of
his memory, Ms. Brown had given a statement to the
authorities which was inconsistent with what the
petitioner told him she would say. He said he had a
memorandum which reflected that Ms. Brown told the
authorities that she did not remember being with the
petitioner on April 30 or May 1, 2003. He said that he
had investigated Ms. Bledsoe and that he thought he
recalled that she was the petitioner's girlfriend and
that she had been with him beginning at midnight or 1:00
a.m. on the night of the crimes and through the rest of
the night. He said the petitioner told him that he spent
the night with Laretha Bledsoe but that he gave accounts
which varied the time the petitioner and Ms. Bledsoe got
together from 10:00 p.m. until 1:00 a.m. He said that
based upon the evidence about when the murder occurred,

32

these witnesses would not have helped the defense because
they could not account for the petitioner's whereabouts
during all of the relevant time period.  He stated that
the petitioner provided him with inconsistent information
about the identity of his alibi witnesses and that for
this reason, he had listed only Tanika Brown on the
Notice of Alibi.

Trial counsel testified that he did not specifically
recall having talked with the petitioner about the
petitioner's right to testify.  He said he did not recall
what advice he gave the petitioner about whether he
should testify and admitted he might have advised the
petitioner not to testify.  He said, however, that
despite his lack of memory, he thought he would remember
had the petitioner had any objection to not testifying or
any lack of understanding of his rights.

The petitioner testified that he gave trial counsel the
names Frederick Pirtle and Tanika Brown as potential
alibi witnesses.  He said trial counsel told him he had
his investigator speak to Ms. Brown and that she
remembered being with the petitioner but could not recall
at what time.  He claimed at one point that counsel did
not contact Mr. Pirtle, but he said later that counsel
told him he had contacted Mr. Pirtle.  He said counsel
told him the witnesses would not be helpful if they could
not establish the exact times they were with the
petitioner on the night of the crimes.  He said he was
with Mr. Pirtle and Ms. Brown from about dark until 11:00
p.m. or 12:00 a.m.  The petitioner denied trial counsel's
assertion that the petitioner had changed his alibi
information.  He stated that he had always told counsel
that he was with both Mr. Pirtle and Ms. Brown and that
he had never mentioned an additional person or said that
Mr. Pirtle or Ms. Brown were not present.  He said
counsel also failed to call Laretha Bledsoe as a witness,
who could verify that he was with Mr. Pirtle and Ms.
Brown and that he was with her afterwards.  He said he
had identified Ms. Bledsoe to counsel but that counsel
did not call her as a witness.

The petitioner testified that he wanted to testify but
that counsel told him he had an attitude problem and
would not be believed.  He said counsel did not explain
to him his right to testify.  He said he did not testify
because counsel advised him not to do so.  He believed,
however, that his testimony would have been beneficial to

the defense.   The petitioner acknowledged that he was asked on the witness stand whether he wanted to testify and that trial counsel asked the court to be allowed to talk with him further.   He admitted that after talking with counsel, he returned to the stand, where he acknowledged that he had been advised of the advantages and disadvantages of testifying and stated that he did not want to testify.   He testified at the post-conviction hearing, however, that he had answered the questions about whether he would testify as trial counsel had instructed, rather than giving accurate responses.

Laretha Bledsoe testified that she had known the petitioner for years and that she had seen him on the night of the victim's murder.   She said that no one from the public defender's office talked to her around the time of trial, although she had spoken with a police officer, whom she told she saw [Brown] with his cousin Tanika and Fred Pirtle around 8:30 or 9:00 p.m.   She said she and the petitioner "called each other back and forth" after that and that the petitioner picked her up and took her to his house around 11:00 p.m. or midnight, where she stayed with him until the following afternoon.   She said that she was subpoenaed for trial by the state but that she was never called as a witness.   She said that had she been called to testify at trial, she would have testified in accord with her testimony at the post-conviction hearing.

Ms. Bledsoe acknowledged, however, that she had given a statement to the authorities saying that on April 30 between 11:00 p.m. and midnight, she had seen the petitioner and Tanika Brown riding around.   She said she did not say anything in this statement about Fred Pirtle being in the car with the petitioner and Ms. Brown because she had not been asked.   She admitted that in this statement, she said that the petitioner came to get her at 1:00 or 2:00 a.m.   She testified she was not sure exactly what time the events happened.

Frederick Pirtle testified he was with the petitioner on the night of the murder.   He said they had been "moseying around" the neighborhood drinking from 8:00 p.m. until about 2:30 or 3:00 a.m.   He said he was never interviewed by anyone from the police department or the public defender's office.   He acknowledged that he had been interviewed by the police after the petitioner's conviction but denied that he remembered that he told

them he actually might have been with the petitioner the
night before the crimes.

The trial court found that the petitioner failed to prove
his claims by clear and convincing evidence.  The court
denied relief.  This appeal followed.

Brown v. State, 2008 WL 4831221 at *4-6.

The post-conviction evidentiary hearing was held on May 30 and
August 10, 2007.  When the post-conviction evidentiary hearing
began on May 30, 2007, the trial transcript was unavailable for
reference and review  because it remained at the Tennessee Court of
Criminal Appeals.  (D.E. 10-16 at 14-15.)  During the May hearing,
the post-conviction court directed that the jury-out Moman hearing
and the prosecutor's closing argument portions of the trial
transcript be filed as exhibits in the record.  (D.E. 10-16 at 51.)
When the post-conviction court decided to continue the evidentiary
hearing, the court directed that the entire trial transcript be
filed as an exhibit and made a part of the record.  The transcript
was filed and available for review before the hearing resumed on
August 10, 2007.

Respondent contends in the motion to dismiss that Brown fails
to demonstrate that the state courts' determinations denying his
four issues of ineffective assistance were contrary to, or involved
an unreasonable application of, clearly established federal law or
were based upon unreasonable determinations of the facts in light
of the evidence presented during post-conviction proceedings.

Issue 1A: Counsel's Unilateral Decision that Petitioner
Brown Would Not Testify

Brown alleges that "Defense Counsel unilaterally waived
Petitioner's right to testify by informing Petitioner that he
should not testify due to his 'attitude problem.'" (D.E. 1 at 5.)
At trial during the Moman hearing, Brown first related that he had
not been advised of the advantages and disadvantages of testifying.
(D.E. 10-8 at 92.)  Counsel requested a recess to talk with Brown
"again." (Id. at 93.)  After the recess, Brown testified that he
had been advised of the advantages and disadvantages of testifying
and voluntarily and personally waived his right to testify. (Id.
at 93-94.)

At the post-conviction evidentiary hearing, Petitioner stated
that counsel never talked with him about testifying. (D.E. 10-16
at 68.)  Brown recalled that, during the trial recess, he told
counsel he wanted to testify and counsel told Brown that he should
not testify because he had an attitude problem and the jury would
not believe him. (Id. at 70; D.E. 10-17 at 14.)  Brown testified
that counsel told him "the DA will eat me up." (D.E. 10-16 at 70-
71.)  The inmate did, however, remember a pre-trial hearing with a
discussion of his prior record being used against him if he
testified. (Id. at 73.)  On cross-examination, Brown testified
that he took counsel's advice because he did not know better at the
time. (Id. at 75.)

36

Trial counsel testified on the first day of the post-conviction hearing that he had been unable to review the trial transcript before the post-conviction hearing and did not have any independent recollection of his advice to Brown about whether or not he should testify.[11]  (D.E. 10-16 at 42-43.)  Counsel stated "as a matter of policy, that if I had had any question about [Brown's understanding of his right to testify] in my mind, it would have - I probably would have remembered the facts and circumstances.  If it had stuck in my - if I - if it had stuck in my mind, then I probably would have remembered his objecting to not testifying."  (Id. at 45.)

The Tennessee Court of Criminal Appeals analyzed Petitioner's claim of ineffective assistance under Strickland stating:

> The petitioner claims that counsel failed to explain the advantages and disadvantages of testifying.  He argues that despite his declaration that he wanted to testify, counsel told him he should not because he had an attitude problem.  The petitioner contends that counsel made an "apparent unilateral decision" about the petitioner's wish to testify.  The trial court found that the petitioner wanted to testify but that trial counsel convinced him otherwise.  The trial court also reviewed the record of trial and found that the petitioner knowingly waived his right to testify at a hearing conducted pursuant to Moman v. State, 18 S.W.3d 152 (Tenn. 1999).  Thus, the court rejected the claim. On appellate review, the evidence does not preponderate against the trial court's findings.

Brown v. State, 2008 WL 4831221 at *8.

---

[11]     Counsel was not questioned about this issue on the second day of the evidentiary hearing even though he was recalled to the stand.

The trial transcript contains the testimony from Petitioner's Moman hearing.  Even when Petitioner testified that he had not been advised of the advantages and disadvantages of testifying, he admitted in answer to the next question that he and counsel had "discussed whether you ought to testify or not." (D.E. 10-8 at 92-93.)  After a recess and consultation with counsel, Brown returned to the courtroom and stated that he had "been advised of the advantages and disadvantages of testifying" and "voluntarily and personally waive[d] the right to testify." (Id. at 93.) Petitioner told the court "that [he did not] want to testify here today." (Id. at 94.)

The decision of the Tennessee Court of Criminal Appeals is not an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1).  The "contrary to" clause is inapplicable because the state court relied on Strickland, the relevant Supreme Court precedent governing claims of ineffective assistance.  The Court of Criminal Appeals applied that clearly established precedent correctly and in an objectively reasonable manner.  Applying Strickland, the state court determined that counsel was not deficient.

Based on this Court's review of the transcript of testimony from the Moman hearing during trial and the post-conviction hearing testimony, the decision of the Tennessee Court of Criminal Appeals did not "result[] in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)( 1). Brown presents no such evidence and no argument that overcomes the presumption. He is not entitled to relief on this issue.

> Issue 2B: Counsel's Failure to Investigate and Interview
> Individuals Who Were Initially Considered Suspects

Brown alleges that trial counsel failed to conduct a reasonable investigation of Scott Haynes and Robert Kimmons, who were also considered suspects early in the criminal investigation. (D.E. 1 at 6.) At the post-conviction evidentiary hearing, trial counsel testified that Haynes and Kimmons were "the number one suspects for several weeks." (D.E. 10-16 at 19.) After counsel learned that Kimmons had been arrested for another crime and was at the Crockett County Jail, he requested permission to talk with Kimmons, but Kimmons' attorneys refused the request. (Id. at 20- 21.) Counsel also stated that he encouraged Officer Rick Kelly to interview Kimmons and talked with Kelly on a daily basis, but counsel did not know if Kelly ever spoke with Kimmons. (Id. at 21- 22.) Because Kimmons' attorneys had refused to allow trial counsel to speak with Kimmons, counsel thought those attorneys would not allow Kimmons to be subpoenaed, and that if Kimmons had been

subpoenaed, he would have asserted his Fifth Amendment right not to testify.  (Id. at 23.)

Because Haynes and Kimmons were accused of a similar crime in Crockett County, trial counsel interviewed the victim in the Crockett County case and the victim gave counsel leads to follow, but they were ultimately not helpful.  (Id. at 26-28.)  Counsel attempted to have law enforcement authorities check the bloody palm print with either Haynes or Kimmons, but the officers would not do so and counsel testified that he used their failure to test the print to cast doubt at trial.  (Id. at 31.)  Trial counsel did locate a witness who identified one of two white men driving around the victim's neighborhood as Haynes.  (Id. at 33.)  Counsel found a witness who testified that she could not be sure of the location of Kimmons after 9:00 p.m. on the night of the murder.  (Id. at 34.)  Trial counsel also uncovered a witness who linked Kimmons to one of the victim's friends.  (Id. at 35.)

Brown testified that counsel talked with him about Haynes and Kimmons being suspects.  (D.E. 10-16 at 66.)  Brown felt, however, that counsel "could've done more" and fought harder.  (Id.)

The Tennessee Court of Criminal Appeals analyzed this claim of ineffective assistance under Strickland stating:

> The petitioner also complains that counsel failed to interview potential suspects Haynes and Kimmons, failed to investigate their involvement, and failed to call them as witnesses.  The trial court found that the petitioner had failed to demonstrate that Haynes and Kimmons were responsible for the crimes and noted that there had been

> evidence at the petitioner's trial that they had been considered but eliminated as suspects. The court found that the petitioner had failed to demonstrate any prejudice from counsel's course of action. We hold that the evidence does not preponderate against the trial court's findings.

Brown v. State, 2008 WL 4831221 at *7.

The decision of the Tennessee Court of Criminal Appeals is not an unreasonable application of clearly established federal law. See 28 U.S.C. 2254(d)(1). The "contrary to" clause is inapplicable because the state court relied on Strickland. This Court, after reviewing the Court of Criminal Appeals decision and the state court record as a whole, is persuaded that the state court applied that clearly established precedent correctly and in an objectively reasonable manner to the facts of this case.

Brown disagrees with the Tennessee Court of Criminal Appeals determination, but fails to offer more than speculation that additional investigation, methods, or strategy could have been employed by counsel to further implicate Haynes and Kimmons as suspects. This Court has reviewed the trial testimonies of the investigating officers, as well as counsel's postconviction testimony, and concludes that the decision of the Tennessee Court of Criminal Appeals did not "result[ ] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding[s]." See 28 U.S.C. § 2254(d)(2). A state court's factual findings are entitled to a presumption of correctness in the absence of clear and

41

convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1).
Petitioner's speculation does not constitute such evidence.  Issue
2B is also without merit.

Issue 2C: Counsel's Failure to Object to the Prosecutor's

Improper Closing Argument

Brown alleges that counsel failed to object to the
prosecutor's "prohibited argument" telling the jury to consider
what might happen on appeal.  (D.E. 1 at 8.)  On the first day of
the post-conviction evidentiary hearing, trial counsel could not
remember "all the facts and circumstances surrounding [the
prosecutor's] closing argument and the State objected to post-
conviction counsel's reading only a portion of the argument into
the record.  When the hearing resumed, Brown testified that counsel
did not object to the prosecutor's argument.  (D.E. 10-17 at 15.)
Trial counsel was recalled to the stand the second day of the
hearing but was not questioned further on this issue.

In ruling on this claim, the post-conviction trial court
determined that, while the argument may have been objectionable,
both counts were merged into count one of the indictment which
rendered any error harmless.  (D.E. 10-15 at 47.)  The trial court
ruled that Petitioner had failed to demonstrate prejudice from
counsel's failure to object.

The Tennessee Court of Criminal Appeals analyzed this claim
under Strickland stating:

42

The petitioner also contends that the state made an improper closing argument at trial:

> The third count would be felony murder, first degree murder in the perpetration of a theft. If for whatever reason you didn't feel that there was sufficient proof to show that there was a robbery, there certainly was a theft, because that twelve dollars was taken.
>
> Now, we're asking you to consider both of these [two counts of felony murder] and return a verdict on both of these simply for purposes of appeal. Because if you convict of both, the Court of Criminal Appeals could later reverse one of those, but the other one stands on its own. So that prevents needless retrials. So, that's why we're asking you, even though it's going to take a little longer, we're asking you to consider both of those counts.

The trial court found that the petitioner failed to demonstrate that the argument affected the outcome of the trial or in any way affected the petitioner. On appeal, the petitioner has not articulated any constitutional basis upon which he claims entitlement to post-conviction relief. See Tenn. Code Ann. § 40-30-103 (providing for post-conviction relief "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States"). We hold that the petitioner has not demonstrated any error in the trial court's ruling denying him relief.

Brown v. State, 2008 WL 4831221, at *8.

Petitioner is entitled to habeas corpus relief only if he demonstrates that Tennessee Court of Criminal Appeals' determination that he was not denied his constitutional right to effective assistance of counsel by counsel's failure to object is contrary to, or an unreasonable application of Strickland or based on an unreasonable determination of the facts. The Tennessee court

43

determined that even if counsel's performance was deficient, Brown failed to meet his burden of establishing actual prejudice on this claim.  In this proceeding, Brown reiterates the argument rejected by the state courts.  He fails to establish actual prejudice and is not entitled to relief on issue 2C.

> Issue 2D: Counsel's Failure to Interview Potential Alibi
> Witnesses

Petitioner alleges that he provided trial counsel with the names of three potential alibi witnesses, Tanika Brown, Frederick Pirtle, and Laretha Bledsoe, and that counsel failed to interview them or call them as witnesses.  At the post-conviction evidentiary hearing, Brown testified that he gave trial counsel the names of people who knew his whereabouts on the night of the murder, but Brown "said they remembered being with me, but they don't remember exactly what time being [sic] with me, and it wouldn't be no [sic] good to have them on the stand."  (D.E. 10-16 at 55; D.E. 10-17 at 10.)  The inmate contended that he was with Tanika Brown and Pirtle during the time that Joshua McElrath testified that Brown was with McElrath.  (D.E. 10-16 at 55-59.)  However, Brown could not remember the exact time he was with Tanika Brown and Pirtle, only that they picked him up when it started getting dark until "probably 11, 11:30 or 12."  (Id. at 58.)  Petitioner testified after that time, he started calling Laretha Bledsoe, who was not asked to testify at trial even though she had been subpoenaed by

the prosecution.  (<u>Id.</u> at 59-60.)  When Brown asked his attorney why he did not call Bledsoe as a witness, counsel told him there was no need.  (<u>Id.</u> at 62.)  Brown admitted that counsel told him that Tanika Brown had been interviewed by the investigator and she did not remember the specific time they were together.  (<u>Id.</u> at 63-64.)

Trial counsel testified that Pirtle and Bledsoe were investigated and were dead-ends.  Bledsoe had been interviewed by law enforcement and her statement differed from what Brown told counsel.  (<u>Id.</u> at 78.)  Furthermore, Bledsoe had told police and counsel's investigator that she was not with Petitioner until between midnight and one, much later than when the murder occurred. (<u>Id.</u> at 80.)  During the investigator's interview with Tanika Brown, she could not remember being with Petitioner either "April 30 or May 1st; said she does not remember anything about it." (<u>Id.</u> at 79.)  Counsel's note regarding Tanika Brown stated, "[s]he said that, 'Sorry, can't help you.'"  (<u>Id.</u> at 84.)  Counsel testified that he was sure that he told Brown on more than one occasion that his alibi witnesses did not pan out.  (<u>Id.</u> at 83.)  Counsel recalled that he and the investigator investigated Petitioner's case for "weeks."  (<u>Id.</u> at 84-85.)

Laretha Bledsoe testified at the post-conviction hearing that she gave a statement to the police, but never spoke with anyone from the public defender's office.  (D.E. 10-17 at 113-14.)

Bledsoe stated that she saw Petitioner with his cousin Tanika and Freddie near Greenwood Street about 8:30 or 9:00 on the night of the murder. (Id. at 24-26.) Bledsoe testified that she and Brown called back and forth after that until he picked her up around 11:00 that night and they went to his house. (Id. at 26-27.) Bledsoe said that she was subpoenaed and came to Brown's trial, but was not called as a witness. (Id. at 28-29.)

Under cross-examination, Bledsoe admitted that in her statement to police she had stated that she saw Brown and Tanika between 11:00 p.m. and 12:00 a.m. in front of the school. (Id. at 31.) She admitted that she did not mention Freddie being in the car, but contended the omission was because she was not asked. (Id. at 32-33.) When confronted with her previous statement that Brown came to her apartment between 1:00 a.m. and 2:00 a.m., she responded that she didn't recall exactly what time it was and could not explain the differences in her statement and post-conviction testimony. (Id. at 34-33.)

Frederick Pirtle testified that he was drinking with Petitioner on the night of the murder from "8 to - on about 2:30, maybe 3 in the morning." (Id. at 37.) When asked if he saw Laretha Bledsoe that night, he stated "she was with him. It must have been some other time when I, you know, walked off or whatever. Other than that, you know, we was in the neighborhood, moseying around until." (Id. at 37.) Pirtle related that he never spoke

with anyone from the police or public defender's officer about being with Brown. (Id. at 38.)   On cross-examination, Pirtle stated that he didn't tell anyone about being with Brown because "that's up to, you know, police officers to go through with that, you know." (Id. at 40.)   Pirtle did give a statement to officers after Brown was convicted in which he said he did not get together with Brown until 8:30 or 9:00. (Id. at 40.)   Pirtle contended that he did not remember telling officers that it may have been the night before the murder that he was with Brown. (Id. at 41.)

Trial counsel was recalled to the stand and testified that Brown did not tell him that he saw Bledsoe earlier in the evening, only that they spent the night together. (Id. at 46.)   Counsel stated that he did not call Bledsoe as a witness even though she was present at trial because he "was going by what my client told me" and "they didn't get together until well after the time that the pathologist said the murder could have happened." (D.E. 10-17 at 48.)   Counsel stated that according to a handwritten note in his file, Brown told him that, on the night of the murder, he was riding around with Josh McElrath, Fred Pirtle, and Tanika Brown. When McElrath and Tanika Brown denied being in a car with Brown, he changed his alibi story. (Id. at 50-51.)   Counsel noted that Petitioner's first story was the only time he mentioned Pirtle's name and that was why Pirtle was not interviewed. (Id. at 51.) Brown was recalled to the stand and denied ever changing his alibi.

47

(Id. at 69.)

The Tennessee Court of Criminal Appeals analyzed the claim under Strickland stating:

> The petitioner complains that trial counsel failed to interview Tanika Brown, Fred Pirtle, and Laretha Bledsoe. He argues that counsel relied on information from others to discount Ms. Brown as a witness and did not have anyone contact Mr. Pirtle or Ms. Bledsoe. He also argues that although Ms. Bledsoe had been subpoenaed by the state and was present at trial, counsel failed to call her as a witness when the state did not do so.
>
> Mr. Pirtle and Ms. Bledsoe testified at the post-conviction hearing. Ms. Brown did not. The trial court found that counsel interviewed Ms. Brown but that she said she did not remember being with the petitioner on the night of the crimes. The court found that Mr. Pirtle was not a credible witness and that his testimony conflicted with that of Ms. Bledsoe. Further, the court found that if either Mr. Pirtle's or Ms. Bledsoe's testimony were accredited, the petitioner would not have established an alibi because under either scenario, he still had time to commit the crimes before meeting these people. Likewise, the court noted the overwhelming evidence of the petitioner's guilt at trial. The court found that the petitioner failed to establish his claim by clear and convincing evidence. We hold that the evidence does not preponderate against the trial court's findings.

Brown v. State, 2008 WL 4831221, at *7.

The decision of the Tennessee Court of Criminal Appeals is not an unreasonable application of clearly established federal law. See 28 U.S.C. § 2254(d)(1). The "contrary to" clause is inapplicable because the state court relied on Strickland. The Court of Criminal Appeals applied that clearly established precedent correctly and in an objectively reasonable manner. Applying Strickland, the state court determined that counsel was

48

not deficient.

Based on this Court's review of the transcript of testimony during the post-conviction hearing, including the testimony of trial counsel, Bledsoe, and Pirtle, the decision of the Tennessee Court of Criminal Appeals did not "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d)(2). A state court's factual findings are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary. 28 U.S. C. § 2254(e)(1). Brown presents no such evidence and no argument that overcomes the presumption. He is not entitled to relief on this issue.

Because Petitioner's claims are devoid of substantive merit, disposition of this petition without an evidentiary hearing is proper. Rule 8(a), Section 2254 Rules. For all the foregoing reasons, Respondent's motion to dismiss (D.E. 9) is GRANTED and Petitioner's motion in opposition (D.E. 11) is DENIED. The petition is DISMISSED. The Clerk shall enter judgment for Respondent.

VI. Appellate Issues

The Court must also determine whether to issue a certificate of appealability ("COA"). Twenty-eight U.S.C. § 2253(a) and (c) require a district court to evaluate the appealability of its decision dismissing a § 2254 habeas petition and to issue a COA

49

only if "the applicant has made a substantial showing of the denial of a constitutional right." See also Fed. R. App. P. 22(b); Lyons v. Ohio Adult Parole Auth., 105 F.3d 1063, 1073 (6th Cir. 1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997) (district judges may issue certificates of appealability). No § 2254 petitioner may appeal without this certificate.

In Slack v. McDaniel, 529 U.S. 473, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000), the Supreme Court stated that § 2253 is a codification of the standard announced in Barefoot v. Estelle, 463 U.S. 880, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983), which requires a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "'adequate to deserve encouragement to proceed further.'" Slack, 529 U.S. at 483-84, 120 S. Ct. at 1603-04 (quoting Barefoot, 463 U.S. at 893-94 & n.4).

The Supreme Court has cautioned against undue limitations on the issuance of COAs:

> [O]ur opinion in Slack held that a COA does not require a showing that the appeal will succeed. Accordingly, a court of appeals should not decline the application for a COA merely because it believes the applicant will not demonstrate an entitlement to relief. The holding in Slack would mean very little if appellate review were denied because the prisoner did not convince a judge, or, for that matter, three judges, that he or she would prevail. It is consistent with § 2253 that a COA will issue in some instances where there is no certainty of

50

ultimate relief.  After all, when a COA is sought, the whole premise is that the prisoner "has already failed in that endeavor."

Miller-El v. Cockrell, 537 U.S. 322, 337, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003) (quoting Barefoot, 463 U.S. at 893 n.4, 103 S. Ct. 3383).  Thus,

> [a] prisoner seeking a COA must prove "something more than the absence of frivolity" or the existence of mere "good faith" on his or her part.  We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

Id. at 338, 123 S. Ct. at 1040 (citing Barefoot, 463 U.S. at 893, 103 S. Ct. 3383); see also id. at 342, 123 S. Ct. at 1042 (cautioning courts against conflating their analysis of the merits with the decision of whether to issue a COA; "The question is the debatability of the underlying constitutional claim, not the resolution of that debate.").[12]

In this case, the issues presented by Petitioner's petition are without merit for the reasons previously stated.  Because he cannot present a question of some substance about which reasonable jurists could differ, the Court DENIES a certificate of appealability.

---

[12]   The Supreme Court also emphasized that "[o]ur holding should not be misconstrued as directing that a COA always must issue."  Miller, 537 U.S. at 337, 123 S. Ct. at 1039.  Instead, the COA requirement implements a system of "differential treatment for those appeals deserving of attention from those that plainly do not."  Id., 123 S. Ct. at 1040.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. § 1915(a)-(b) does not apply to appeals of orders denying § 2254 petitions.  <u>Kincade v. Sparkman</u>, 117 F.3d 949, 951 (6th Cir. 1997).  Rather, to appeal <u>in forma pauperis</u> in a § 2254 case, and thereby avoid the $455 appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, Petitioner must seek permission from the district court under Federal Rule of Appellate Procedure 24(a).  <u>Id.</u> at 952.  Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.  Fed. R. App. P. 24(a)(1).  However, Rule 24(a) also provides that, if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal <u>in forma pauperis</u>, Petitioner must file his motion to proceed <u>in forma pauperis</u> in the appellate court.  <u>See</u> Fed. R. App. P. 24(a)(4)-(5).

In this case, for the same reasons the Court denies a COA, the Court determines that any appeal would not be taken in good faith.  It is therefore CERTIFIED, pursuant to Fed. R. App. P. 24(a), that any appeal in this matter would not be taken in good faith, and leave to appeal <u>in forma pauperis</u> is DENIED.  If Petitioner files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to proceed <u>in forma pauperis</u> and supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days.

IT IS SO ORDERED this 30th day of September 2010.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE